Xin Tian, Esq. (State Bar No. 363544)
25 S Raymond Avenue, Suite 300
Alhambra, CA 91801
TEL: 949-213-5199 | EMAIL: ALEXTIAN@POINTLAW.COM
ATTORNEY FOR PETITIONER WENFENG FAN

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| WENFENG FAN,<br><br>Petitioner,<br><br>v.<br><br>JAMES JANECKA, Warden-Facility Administrator, Adelanto ICE Processing Center; THOMAS P. GILES, Field Office Director, Los Angeles Field Office, U.S. Immigration and Customs Enforcement; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security,<br><br>Respondents. | Case No. _______________<br><br>**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Related to No. 5:26-cv-04330-JGB-MBK and No. 5:25-cv-03619-SK]<br><br>**IMMIGRATION DETENTION — IMMEDIATE RELEASE REQUESTED**<br><br>[Ex Parte Application for Temporary Restraining Order Filed Concurrently]<br><br>[Declarations of Wenfeng Fan, Xiaoman Fan, and Xin Tian and Exhibits A–N Filed Concurrently |

# PETITION FOR WRIT OF HABEAS CORPUS

## I. INTRODUCTION

**Petitioner Wenfeng Fan lived openly in the Los Angeles area for eleven and a half years. For more than eight of those years the government knew exactly who he was and where he lived:** it accepted his asylum application in March 2017, fingerprinted and photographed him that same month, reclassified him in its own records as an asylum applicant, twice granted him employment authorization and mailed the cards to his home, twice verified, through federal records, documents establishing that his presence in the United States was authorized under federal law, when the California DMV issued him a REAL ID driver's license at that address, accepted a relative petition filed for him in February 2024, and interviewed him on that petition later in 2024. **In all that time the government never detained him, never placed him in removal proceedings, never asked him to report, and never told him that his liberty was at risk.**

**This Petition does not ask the Court to review any custody determination made by an Immigration Judge, and it does not ask the Court to weigh the evidence presented at any bond hearing.** Mr. Fan's prior habeas petition in this District challenged the procedures used at his bond hearings; that case was dismissed without prejudice, and the claim presented here was neither raised nor decided there. This Petition asks a different and prior question: whether the government could lawfully take Mr. Fan into custody at all without first giving him notice and a hearing.

On July 29, 2025, Border Patrol agents working under an interior enforcement operation—one that, by the government's own description, was aimed at noncitizens

with executable final orders of removal, which Mr. Fan has never had—staked out his home in San Gabriel from 5:00 a.m., using an "intelligence packet" that the government says it had assembled in advance. When Mr. Fan stepped outside to walk his dog, they arrested him on the sidewalk. **No one had given him notice. No one had given him an opportunity to be heard. No neutral decision-maker had considered whether there was any reason to take him into custody.** The agents refused his request to call a lawyer. The only charge the government has ever brought against him is that he overstayed a visa that expired in 2014. He has no criminal history. He has now been detained for more than fifteen months.

This Petition presents a single claim, and it is one no court has considered: **that the Fifth Amendment's Due Process Clause required notice and a hearing before Respondents stripped Mr. Fan of a liberty he had exercised, with the government's knowledge and acquiescence, for more than a decade.** Courts in this District have repeatedly so held on materially identical facts, and have ordered release as the remedy. *Yu v. Giles*, No. 5:26-cv-04692-MBK (C.D. Cal. Aug. 21, 2026) (Ex. L); *Zhou v. Janecka*, No. 5:26-cv-04167-DTB (C.D. Cal. Aug. 14, 2026) (Ex. M); *Xu v. Janecka*, No. 5:26-cv-05747-PD (C.D. Cal. Oct. 9, 2026) (Ex. N); *Martinez v. Acting Warden of the Adelanto Detention Center*, No. 5:26-cv-02635-ACCV, 2026 WL 2262269 (C.D. Cal. Aug. 5, 2026); *Gagik T. v. Chestnut*, No. 1:26-cv-04337-MWJS, 2026 WL 1837413 (E.D. Cal. June 25, 2026).

A bond hearing held after the fact does not supply the process that was due before the deprivation. Because Mr. Fan's detention has been unlawful from its first moment, the Court should issue the writ and order his immediate release.

## II. CUSTODY

1. Petitioner is in the physical custody of Respondents at the Adelanto ICE Processing Center, 10400 Rancho Road, Adelanto, California 92301, within the Eastern Division of this District, where he has been detained continuously since July 29, 2025. Fan Decl. ¶ 1; Ex. A at 1.

## III. JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. § 2241(c)(3), Article I, § 9, cl. 2 of the Constitution, and 28 U.S.C. § 1331. Petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus is the traditional and appropriate vehicle for challenging the lawfulness of immigration detention. *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

3. No statute strips this Court of jurisdiction. 8 U.S.C. § 1226(e) bars review of the Executive's discretionary judgments regarding detention and release; it does not bar constitutional challenges to the process by which a noncitizen is taken into custody. *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018); *Singh v. Holder*, 638 F.3d 1196, 1200–02 (9th Cir. 2011). **Petitioner does not challenge any Immigration Judge's custody determination; he challenges the constitutionality of his arrest and detention without any prior process.** Nor do 8 U.S.C. § 1252(a)(5) or (b)(9), which govern review of removal orders, apply to a challenge to detention. *Jennings*, 138 S. Ct. at 841.

4. Venue is proper in this District because Petitioner is detained here and his immediate custodian, Respondent Janecka, is located here. *Rumsfeld v. Padilla*, 542 U.S. 426, 435, 443 (2004).

5. This action is related, within the meaning of L.R. 83-1.3.1, to *Fan v. Edlow*, No. 5:26-cv-04330-JGB-MBK (C.D. Cal., filed July 29, 2026), a pending action by Petitioner seeking adjudication of the Form I-730 petition filed on his behalf, and to *Fan v. Bondi*, No. 5:25-cv-03619-SK (C.D. Cal.), a habeas action challenging the procedures used at Petitioner's Immigration Court bond hearings, which was dismissed without prejudice on August 6, 2026 and did not address the claim presented here. A Notice of Related Cases is filed concurrently.

## IV. PARTIES

6. Petitioner Wenfeng Fan is a 55-year-old native and citizen of the People's Republic of China, A# 212-971-010. Fan Decl. ¶ 1; Ex. A at 1.

7. Respondent James Janecka is the Warden and Facility Administrator of the Adelanto ICE Processing Center, where Petitioner is detained, and is Petitioner's immediate custodian. He is sued in his official capacity.

8. Respondent Thomas P. Giles is the Field Office Director of the Los Angeles Field Office of U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations, which has custody of Petitioner and to which Petitioner was turned over following his arrest. Ex. A at 3. He is sued in his official capacity.

9. Respondent David J. Venturella is the Acting Director of ICE, the agency with custody of Petitioner. He is sued in his official capacity.

10. Respondent Markwayne Mullin is the Secretary of the U.S. Department of Homeland Security ("DHS"), which is responsible for the administration of the immigration laws and for Petitioner's arrest and detention. He is sued in his official capacity.

## V. EXHAUSTION

11. No statute requires exhaustion of administrative remedies before a noncitizen may challenge the constitutionality of his detention under § 2241. Exhaustion is a prudential doctrine, and courts in this Circuit waive it where administrative remedies are inadequate or futile, where the petitioner would suffer irreparable injury, or where the agency lacks authority to decide the question presented. *Laing v. Ashcroft*, 370 F.3d 994, 998, 1000 (9th Cir. 2004); *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007).

12. Every basis for waiver is present. First, the claim is constitutional, and neither an Immigration Judge nor the Board of Immigration Appeals ("BIA") has authority to adjudicate it. *Sola v. Holder*, 720 F.3d 1134, 1135 (9th Cir. 2013); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir. 2006); *Matter of Fuentes-Campos*, 21 I. & N. Dec. 905, 912 (BIA 1997). Second, no administrative remedy can supply what Petitioner was denied: a hearing *before* he was taken into custody. The court in *Yu* excused exhaustion for exactly that reason, agreeing that "neither tribunal can turn back the clock to furnish the pre-deprivation hearing Petitioner was owed." Ex. L at 6 (internal quotation marks omitted). Third, the claim turns on undisputed facts drawn from the

government's own records; no administrative record is needed to resolve it. *Yu*, Ex. L at 7 (quoting *Miri v. Bondi*, No. 5:26-cv-00698-MEMF-MAR, 2026 WL 622302, at *10–11 (C.D. Cal. Mar. 5, 2026), and *Hernandez v. Sessions*, 872 F.3d 976, 989 (9th Cir. 2017)). Fourth, every day of unlawful detention is irreparable.

1. Petitioner has in any event pursued the administrative remedies available to him. He requested bond from the Immigration Court repeatedly; the Immigration Judge issued decisions on September 10, October 28, and December 3, 2025, and February 4, 2026; and on February 5, 2026 Petitioner appealed the February 4, 2026 decision to the BIA, where it has been pending without decision for more than nine months. Ex. H; Ex. J; Fan Decl. ¶ 25. That appeal concerns the Immigration Judge's custody determination. **It cannot address, and this Petition does not ask the Court to address, whether that determination was correct.** See *Xu*, Ex. N at 6 (exhaustion not required where BIA bond appeal was pending, because the BIA cannot adjudicate the constitutional claim); *Zhou*, Ex. M at 8 n.4; *Yu*, Ex. L at 5–7.

## VI. STATEMENT OF FACTS

### A. Entry, residence, and eleven years of open life in Los Angeles

2. Petitioner was lawfully admitted to the United States at Los Angeles International Airport on December 12, 2013, as a B-2 visitor, with authorization to remain until June 11, 2014. Ex. A at 3; Ex. B at 1; Fan Decl. ¶ 3. He has remained in the United States continuously since then and has never left. Fan Decl. ¶ 3.

3. According to the government's own arrest record, Petitioner's visa was revoked on February 14, 2014. Ex. A at 3. Petitioner received no notice of the revocation at the time and first learned of it from the arresting agents on July 29, 2025. Fan Decl. ¶ 9. **The government has thus known since February 2014 that Petitioner was in the United States without a valid visa. It took no step to detain him for the next eleven and a half years.**

4. Petitioner has lived in the Los Angeles area throughout. In 2017 he lived at 815 N. 1st Street, Alhambra, the address to which USCIS mailed his biometrics notice. Ex. C. He later moved to 903 E. Wells Street, San Gabriel, where he lived for many years until the day of his arrest. Fan Decl. ¶ 4; X. Fan Decl. ¶ 2. That address appears on the California driver's license issued to him on October 15, 2019, and on the renewed license issued February 27, 2024, Ex. E, and it is the address at which ICE's arrest team conducted surveillance on July 29, 2025, describing it as "his primary residence." Ex. A at 1, 3.

5. Petitioner's daughter, Xiaoman Fan, a lawful permanent resident of the United States since 2014, lived with him at the San Gabriel home from about 2020, when she was in sixth grade, until the day he was arrested; he drove her to and from school almost every day. X. Fan Decl. ¶¶ 1–2; Fan Decl. ¶ 5; Ex. G. Petitioner's wife, Feifei Zhou, was granted asylum in the United States and later became a lawful permanent resident. Fan Decl. ¶ 6.

6. Petitioner has lived publicly. He has served for more than six years as chairman of the Los Angeles chapter of the Federation for a Democratic China, an organization founded in 1989, and has taken part in public protests in front of the Chinese Consulate in Los Angeles and in Las Vegas and Seattle, and in annual June 4 commemorations, activities that have been reported in the media

with his name and photograph. Fan Decl. ¶ 7; see also Ex. K at 2 (describing Petitioner as "the chairman of a local organization that opposes the Chinese Communist Party"). He has filed tax returns for many years. Fan Decl. ¶ 7. **He has no criminal convictions in the United States.** Ex. A at 2 ("Subject has no criminal history"); Ex. K at 2; Fan Decl. ¶ 24.

7. Petitioner's only passport expired in January 2021 and was not returned to him when he submitted it for renewal; he has had no passport or travel document since. Fan Decl. ¶ 8.

**B. The government knew who Petitioner was and where he lived, and chose not to detain him**

8. On March 2, 2017, Petitioner filed a Form I-589 application for asylum and withholding of removal with the USCIS Los Angeles Asylum Office, receipt number ZLA1700051600. Ex. C; Ex. A at 3; Fan Decl. ¶ 10. The government's arrest record states that "[o]n the same date, USCIS changed FAN's class of admission to AO, asylee applicant." Ex. A at 3.

9. On March 21, 2017, as instructed by USCIS, Petitioner appeared at the Application Support Center in El Monte, California, where he was fingerprinted and photographed. Ex. C (notice stamped "MAR 21 2017"); Fan Decl. ¶ 11.

10. On August 11, 2017, Petitioner filed a Form I-765 application for employment authorization. Ex. A at 3. **USCIS granted him employment authorization twice and mailed the cards to his home;** the second Employment

Authorization Document, category C08, was valid from September 21, 2019 to September 20, 2021. Ex. D; Fan Decl. ¶ 12.

11. On October 15, 2019, the California Department of Motor Vehicles issued Petitioner a REAL ID driver's license at the San Gabriel address, and on February 27, 2024 it issued him a renewed license valid through 2029. Ex. E; Fan Decl. ¶ 13. Both licenses are marked "LIMITED-TERM," the designation California uses for a license issued upon verification, through federal records, of a document establishing that the holder's presence in the United States is authorized under federal law. See Cal. Veh. Code § 12801.5(a); *id.* § 12801.8(b).

12. On February 15, 2024, Petitioner's wife, as an asylee, filed a Form I-730 Refugee/Asylee Relative Petition on his behalf, receipt number SRC2410550177. Ex. F; Fan Decl. ¶ 6. USCIS's receipt notice stated that it could reuse Petitioner's previously captured fingerprints. Ex. F. **In 2024 USCIS scheduled Petitioner for an interview on that petition; he appeared as instructed and was interviewed,** after which USCIS's case status read "Interview Was Completed And My Case Must Be Reviewed." Ex. F; Fan Decl. ¶ 14. No decision has issued.

13. In the more than eight years between March 2017 and July 2025, USCIS never scheduled Petitioner for an asylum interview and, apart from the approval notices for his work permits, never wrote to him about his asylum application. Fan Decl. ¶ 15. **ICE never contacted him in any way—no letter, no call, no visit, no instruction to report.** Fan Decl. ¶ 16; X. Fan Decl. ¶ 3. He had never been detained by immigration authorities, had never been placed in removal

proceedings, and had never been told that he might be detained or that he could request a hearing. Fan Decl. ¶ 16.

14. Throughout that period the government had Petitioner's address on his asylum application and the I-730 petition, mailed his work permits to his home, and twice verified his status to the DMV. Fan Decl. ¶ 16. **When it finally decided to arrest him, it went directly to that address.** Ex. A at 3.

**C. The arrest of July 29, 2025**

15. The government's account of the arrest is recorded on the Form I-213 prepared by ICE on July 31, 2025. Ex. A. According to that record, Petitioner was arrested by U.S. Border Patrol agents from the El Centro Sector "working in support of Immigration and Customs Enforcement's Operation At Large in the Los Angeles, CA area." Ex. A at 2. The I-213 describes that operation as "a 6-month, nationwide operation to significantly increase Operation At Large arrests of illegal aliens, focusing on individuals with executable final orders of removal." *Id.* **Petitioner has never been the subject of a removal order; on July 29, 2025 he had never even been placed in removal proceedings.** Fan Decl. ¶ 16; Ex. B.

16. The I-213 states that arrest teams are "provided with intelligence packets containing information on illegal aliens who have been found to be amenable to deportation or removal through extensive research from various DHS, CBP, and USBP databases," that "[t]hese packets include a signed I-200 (Warrant for Arrest of Alien)," and that "[o]n this date, my team was provided with an intelligence packet for Wenfeng FAN." Ex. A at 2. At 5:00 a.m. on July 29, 2025, "[t]he team began surveillance operations at 903 E. Wells St. San Gabriel,

CA. **This address is associated with FAN as being his primary residence."** Ex. A at 2–3. The day before, Petitioner had noticed two men in a parked car outside his home watching him for a long time. Fan Decl. ¶ 17.

17. The agents watched Petitioner open his front gate at 7:40 a.m. and "positively matched" him to their packet. Ex. A at 3. At about 8:50 a.m., when he left the house to walk his dog and "started to walk east bound away from his house," two agents approached and identified themselves. *Id.*; Fan Decl. ¶ 18. The arresting agent wrote: "I explained to FAN that he applied for asylum and had a B1/B2 visa however his visa was revoked and is now illegally present in the United States." Ex. A at 3. The explanation was in English, which Petitioner does not understand; one agent showed him a picture of an English-language document on a phone, and no one explained in Chinese what it was or why he was being arrested. Fan Decl. ¶¶ 2, 19.

18. **Petitioner asked to call a lawyer. The I-213 records the answer: "He was advised that he could later contact one once he was at a processing detention center."** Ex. A at 3; Fan Decl. ¶ 20. He asked to go back inside for a jacket; the agents refused. Fan Decl. ¶ 20. They took his phone, which contained materials he had gathered for his immigration case; it has not been returned and does not appear on the property inventory ICE gave him. Fan Decl. ¶ 21. At 9:10 a.m. he was turned over to ICE Enforcement and Removal Operations and taken to the B-18 processing facility in downtown Los Angeles, and later to Adelanto. Ex. A at 3; Fan Decl. ¶ 22.

19. Petitioner's daughter was asleep inside the house. No one knocked, no one spoke to her, and no one left any paper or notice at the home; she learned her father was gone when her stepmother told her. X. Fan Decl. ¶ 4.

20. **Before that moment, no one had notified Petitioner that his liberty was at risk, no one had given him an opportunity to be heard, and no judge or other neutral official had held any hearing of any kind.** Fan Decl. ¶ 23. The only warrant referenced in the government's own record is the Form I-200 said to be included in the agents' "intelligence packet"—an administrative form issued by ICE's own officers, 8 C.F.R. § 236.1(b), not a determination by any neutral decision-maker.

21. On August 2, 2025, DHS issued a Notice to Appear **charging Petitioner with a single ground of removability:** that he remained in the United States beyond June 11, 2014 without authorization, in violation of 8 U.S.C. § 1227(a)(1)(B). Ex. B at 1. The I-213 itself records that Petitioner "has no criminal history." Ex. A at 2. DHS treated Petitioner's detention as discretionary detention under 8 U.S.C. § 1226(a). Ex. K at 2–3, 6.

**D. Custody proceedings after the arrest**

22. Everything that followed occurred after Petitioner had already been in custody. Petitioner sought release from the Immigration Court. His first request, scheduled for hearing on August 15, 2025, was withdrawn without prejudice by his then-counsel. Ex. H. On September 10, 2025, at a hearing at which Petitioner bore the burden of proof, an Immigration Judge denied bond on a form order stating that Petitioner had "failed to meet his burden." Ex. H; Ex. K at 5. On October 28 and December 3, 2025, Immigration Judges denied renewed requests on the ground that Petitioner had not shown changed circumstances. Ex. H.

23. At those hearings the government's evidence concerning Petitioner consisted of a biometric encounter printout and three Chinese-language internet news articles dated January 23, January 26, and February 13, 2014, with translations. Ex. I; Ex. K at 3–4. **The government produced no warrant, no charging document, and no INTERPOL notice.** Ex. I; see Ex. K at 7 n.3 (noting that the I-213 "nowhere mentions" a Red Notice and that the court could not determine the source of the Immigration Judge's reference to one). Every one of those articles had been publicly available since early 2014, more than three years before Petitioner filed his asylum application and eleven years before his arrest. Ex. I.

24. On February 4, 2026, following a hearing under *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013), at which the government bore the burden of proof, a different Immigration Judge denied release. Ex. K at 6–7. That hearing took place more than six months after Petitioner's arrest. On February 5, 2026, Petitioner appealed that decision to the BIA. Ex. J; Fan Decl. ¶ 25. Petitioner's brief was filed in June 2026, and the appeal remains pending without decision. Ex. J.

25. Petitioner does not ask this Court to review any of those decisions. He describes them because they establish two facts central to this Petition: **that every custody proceeding he has received came only after the deprivation, and that none of them asked—or could have asked—the question presented here, which is whether the government could lawfully take him into custody on July 29, 2025 without any process at all.**

**E. The prior habeas proceeding**

26. On December 29, 2025, Petitioner, then acting without counsel, filed a petition for a writ of habeas corpus in this District, *Fan v. Bondi*, No. 5:25-cv-03619-SK. Ex. K at 1. Counsel later appeared and filed a First Amended Petition on April 6, 2026. *Id.* The amended petition raised three claims, all directed at the Immigration Court bond proceedings: that the Immigration Judge's refusal to take live testimony at the February 2026 hearing violated due process; that the Immigration Judge had misallocated the burden of proof at the September 2025 hearing; and that the September 2025 order was too conclusory. Ex. K at 25.

27. On August 6, 2026, the Court (Kim, M.J.) denied the first claim on the merits, found the second and third moot because the February 2026 hearing had superseded the September 2025 order, held that the remaining challenges to the Immigration Judge's factual findings were barred by 8 U.S.C. § 1226(e), and alternatively dismissed for failure to exhaust before the BIA. Ex. K at 25–40. Judgment was entered the same day dismissing the action without prejudice. Ex. K (Judgment, Dkt. 36, Aug. 6, 2026).

28. **The prior petition did not allege, and the Court did not consider, that Petitioner's arrest and initial detention on July 29, 2025 violated due process because he was given no notice and no hearing before being taken into custody.** The Court's decision addressed only the adequacy of the procedures used at bond hearings held months after the arrest. The Court's own recitation of the facts, however, confirms the premise of this Petition: that ICE "arrested petitioner outside his home in San Gabriel, California, as part of a targeted enforcement operation," and that he "has no criminal convictions in the United States." Ex. K at 2–3.

**F. The pending BIA appeal and mandamus action**

29. Petitioner's appeal of the February 4, 2026 custody decision has been pending before the BIA since February 5, 2026. Ex. J. The appeal challenges the Immigration Judge's custody determination; it does not and could not present the constitutional claim raised here. *Id.*; see *Sola*, 720 F.3d at 1135.

30. On July 29, 2026, Petitioner, again acting without counsel, filed an action in this District seeking to compel USCIS to adjudicate the Form I-730 petition filed on his behalf in February 2024. *Fan v. Edlow*, No. 5:26-cv-04330-JGB-MBK. That action is pending before Judge Bernal and Magistrate Judge Kaufman. Fan Decl. ¶ 26.

**G. Petitioner today**

31. Petitioner has been detained for more than fifteen months. Fan Decl. ¶ 29. His asylum application is now before the Immigration Judge; his merits hearing in May 2026 was adjourned when he fell ill in the courtroom, and the case remains pending. Fan Decl. ¶ 27. He has lost the home he rented in San Gabriel. Fan Decl. ¶ 30. His daughter, who lived with him until the morning of his arrest, has had to return to her mother's home, has left high school, and sees a psychologist weekly. X. Fan Decl. ¶¶ 5–7. Petitioner has been diagnosed in detention with essential hypertension requiring three medications and with an adjustment disorder with anxiety and depressed mood, and his condition has deteriorated with the length of his confinement. Fan Decl. ¶¶ 33–34.

32. If released, Petitioner will live at 708 Kenmore Drive, San Gabriel, California 91776, the home of his friend Ma Yunlong, who has agreed to house him, and he will attend every hearing the Immigration Court schedules. Fan Decl. ¶¶ 36–37.

## VII. CLAIM FOR RELIEF

**Deprivation of Liberty Without Procedural Due Process (Fifth Amendment)**

33. Petitioner realleges and incorporates paragraphs 1 through 44.

34. The Due Process Clause of the Fifth Amendment protects every person within the United States, including noncitizens "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[T]he government's discretion to incarcerate noncitizens is always constrained by the requirements of due process." *Hernandez*, 872 F.3d at 981.

35. For more than eight years before July 29, 2025, Respondents knew Petitioner's identity, immigration status, and address, exercised authority over him by adjudicating his applications and granting him work authorization, and chose not to detain him. **That sustained course of conduct gave Petitioner a constitutionally protected liberty interest in remaining free from detention unless and until Respondents afforded him notice and a hearing before a neutral decision-maker.** *Yu*, Ex. L at 8–9; *Zhou*, Ex. M at 9–11; *Martinez*, 2026 WL 2262269, at *5; *Gagik T.*, 2026 WL 1837413; *Kharitonova v. Albarran*, No. 3:26-cv-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026).

36. Due process required that, before Respondents deprived Petitioner of that liberty, they provide him notice and an opportunity to be heard before a neutral

decision-maker on whether his detention was justified. *Mathews v. Eldridge*, 424 U.S. 319, 333, 335 (1976); *Zinermon v. Burch*, 494 U.S. 113, 127–28 (1990); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). **Respondents provided none.** They surveilled Petitioner's home for hours on the strength of a file they had assembled in advance, arrested him on the sidewalk, refused his request to call a lawyer, and placed him in custody without any prior hearing.

37. **No exigency excused the omission.** Respondents had known Petitioner's address for years and his immigration status since 2014; the information in their "intelligence packet" was eleven years old; Petitioner had no travel document and a family, a home, and pending applications in Los Angeles; and the operation under which he was arrested was, by Respondents' own account, directed at noncitizens with final orders of removal, which Petitioner has never had.

38. **The custody proceedings Respondents afforded Petitioner after the fact did not and could not supply the process that was due before the deprivation.** *Zhou*, Ex. M at 13–14; *Xu*, Ex. N at 13–14; *Yu*, Ex. L at 10; *Mumaev v. Semaia*, No. 5:25-cv-03409-FLA (MAR), 2026 WL 530765, at *6 (C.D. Cal. Feb. 20, 2026); *Charan S. v. Warden of the California City Det. Facility*, No. 1:26-cv-03017-TLN-JDP, 2026 WL 1144158, at *7 (E.D. Cal. Apr. 28, 2026).

39. **Petitioner's detention has therefore been unlawful since its inception, in violation of the Due Process Clause of the Fifth Amendment, and he is entitled to a writ of habeas corpus directing his release.**

## VIII. PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1. Assume jurisdiction over this matter;

2. Declare that Petitioner's arrest and detention without notice and a pre-deprivation hearing violate the Due Process Clause of the Fifth Amendment;

3. Issue a writ of habeas corpus and order Respondents to release Petitioner from custody immediately, restoring him to the status quo that existed before July 29, 2025;

4. Enjoin Respondents from re-detaining Petitioner without first providing him written notice and a hearing before a neutral decision-maker at which the government bears the burden of proving, by clear and convincing evidence, that he is a flight risk or a danger to the community;

5. Order Respondents to return all property seized from Petitioner at the time of his arrest, including his mobile telephone;

6. Order Respondents to file a status report confirming Petitioner's release within three days of the Court's order;

7. Award Petitioner reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8. Grant such other and further relief as the Court deems just and proper.

Dated: November 08, 2026

Respectfully submitted,

*/s/* Xin Tian
Xin Tian, Esq.
Attorney for Petitioner Wenfeng Fan

**VERIFICATION**

I, Xin Tian, am counsel for Petitioner Wenfeng Fan in this action. I make this verification on Petitioner's behalf pursuant to 28 U.S.C. § 2242 because Petitioner is detained at the Adelanto ICE Processing Center and does not read English. I have read the foregoing Petition. The factual allegations in it are true and correct to the best of my knowledge, information, and belief, and are based on the documents attached as Exhibits A through N, on Petitioner's sworn declaration, and on the sworn declaration of his daughter, Xiaoman Fan, all filed herewith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November ___, 2026, at Alhambra, California.

*/s/* Xin Tian
Xin Tian, Esq.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. THIS PETITION PRESENTS A CLAIM THAT HAS NEVER BEEN RAISED OR DECIDED

Respondents will point to *Fan v. Bondi*, No. 5:25-cv-03619-SK. That case does not bar this one; it confirms that the question presented here remains open.

**The prior petition challenged bond hearings.** Its three claims were that the Immigration Judge should have taken live testimony at the February 2026 hearing, that the burden of proof had been misallocated at the September 2025 hearing, and that the September 2025 order was conclusory. Ex. K at 25. The Court decided exactly those questions—and, in dismissing the remainder for want of jurisdiction under § 1226(e) and for failure to exhaust, decided nothing else. Ex. K at 25–40. Judgment was entered without prejudice. Ex. K (Judgment, Dkt. 36). **No court has ever considered whether the Constitution permitted Respondents to take Petitioner's liberty on July 29, 2025, without notice or a hearing. That is the only question this Petition asks.**

No statute bars a second § 2241 petition by an immigration detainee. The successive-petition limits of 28 U.S.C. § 2244 apply only to a person detained "pursuant to a judgment of a court of the United States"; Petitioner is detained by an executive agency. *Barapind v. Reno*, 225 F.3d 1100, 1111 (9th Cir. 2000) (§ 2244's gatekeeping provisions do not apply to a § 2241 petition filed by an immigration detainee). The only potential limit is the equitable abuse-of-the-writ doctrine, which asks whether the petitioner is relitigating a claim already decided or withholding a claim he had a full and fair opportunity to present, and which the government bears

the burden of pleading with particularity. *McCleskey v. Zant*, 499 U.S. 467, 477–78, 494–95 (1991); *Sanders v. United States*, 373 U.S. 1, 15–17 (1963).

**The doctrine has no application here, for four reasons.** First, the present claim is substantively distinct from the claims adjudicated in the first petition: those claims attacked the procedures used at bond hearings held months after the arrest; this claim attacks the legality of the initial seizure itself. Second, the first court never considered the legality of that seizure. The question was not put at issue by either side, and the court's analysis—mootness, § 1226(e), and exhaustion—was confined to the bond proceedings. Ex. K at 25–40. **A petitioner has not had a full and fair opportunity to litigate a claim that no one raised and no court decided.** Third, the judgment was entered without prejudice and therefore carries no preclusive effect. Ex. K (Judgment, Dkt. 36). Fourth, even if cause were required, it exists. The claim is now supported by a materially developed body of authority that did not exist when the amended petition was filed on April 6, 2026—including this District's decisions in *Martinez* (Aug. 5, 2026), *Yu* (Aug. 21, 2026), *Zhou* (Aug. 14, 2026), and *Xu* (Oct. 9, 2026), and the Eastern District's decision in *Gagik T.* (June 25, 2026)—which have confirmed and extended the pre-deprivation principle to noncitizens who, like Petitioner, had never previously been released from immigration custody. The prejudice is Petitioner's continuing custody. *McCleskey*, 499 U.S. at 494–95; *Sanders*, 373 U.S. at 15–17 (successive claim must be entertained where the "ends of justice" so require).

The court in *Xu* confronted precisely this situation. The petitioner there had litigated an earlier habeas case about a bond decision, received a court-ordered bond hearing at which the government bore the burden, lost that hearing, and appealed to the BIA; his second petition raised "for the first time" the claim that his arrest without pre-deprivation process violated due process. Ex. N at 2. **The court reached the**

**merits, held that exhaustion was not required, held that the subsequent bond hearings had not cured the violation, and ordered release.** Ex. N at 6, 13–15. The same result follows here.

## II. PETITIONER HAS A PROTECTED LIBERTY INTEREST IN HIS CONTINUED FREEDOM

A procedural due process claim proceeds in two steps: whether the petitioner holds a protected liberty interest, and, if so, what process the Constitution requires before the government may take it away. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Zhou*, Ex. M at 9. Petitioner satisfies the first step.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects," and the Clause protects noncitizens "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 690, 693. Courts in this Circuit have long held that a noncitizen whom the government has released from custody acquires a liberty interest in remaining free that cannot be revoked without process. *Saravia v. Sessions*, 905 F.3d 1137, 1145–46 (9th Cir. 2018); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *Sun v. Warden of Adelanto ICE Processing Ctr.*, No. 5:26-cv-03595-MBK, 2026 WL 2058437, at *1 (C.D. Cal. July 14, 2026); cf. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

**The same interest arises where the government never detained the noncitizen in the first place but, with full knowledge of his presence, status, and address, chose to let him remain at liberty while it exercised authority over his applications.** As Judge Corley explained, "[a]lthough the Government did not detain and then release her, it made a decision *not* to detain her in the first place; Petitioner

thus has the same liberty interest in her continued freedom as an individual who was initially detained." *Kharitonova*, 2026 WL 531441, at *2. Courts in this District have adopted that reasoning in a line of decisions involving facts indistinguishable from Petitioner's:

- In *Yu*, Judge Kaufman held that a Chinese asylum applicant who overstayed a visitor visa, filed for asylum, received employment authorization, and lived openly for five years held a protected liberty interest, because "the Government elected not to detain him and instead granted him employment authorization while his asylum case remains pending," and the court agreed with the petitioner that "for more than five years the Government knew exactly who and where Petitioner was, authorized him to work, and chose not to detain him." Ex. L at 9 (citing *Martinez*, 2026 WL 2262269, at *5; *Gagik T.*, 2026 WL 1837413; *Kharitonova*, 2026 WL 531441, at *2).

- In *Zhou*, Judge Bristow found a liberty interest where the government "had full knowledge of Petitioner's identity, immigration status and location during the pendency of her immigration applications" and "continuously elected not to detain Petitioner while exercising authority over her legal proceedings," and collected the decisions of this District and the Eastern and Southern Districts finding "a substantial liberty interest in circumstances where noncitizens commenced immigration proceedings, and the government chose not to detain them." Ex. M at 9–11.

- In *Gagik T.*, the Eastern District granted release to a visa overstayer who had applied for asylum, received employment authorization, and remained out of custody for six years. 2026 WL 1837413; see Ex. M at 10.

**Petitioner's showing is stronger than any of theirs.** As detailed above (¶¶ 15–26), for more than eight years the government repeatedly exercised authority over Petitioner while knowingly leaving him at liberty—through his asylum application and biometrics, two grants of employment authorization mailed to his home, two REAL ID verifications at his San Gabriel address, and the I-730 petition on which it interviewed him and let him walk out—and it had known since February 14, 2014 that his visa had been revoked, the very fact the arresting agent recited as the reason for his arrest. Ex. A at 3. The government's knowledge of him spans not five or six years but more than eight; his liberty spans eleven and a half. That sustained course of conduct exceeds the deliberate acquiescence found sufficient in *Yu*, *Zhou*, *Martinez*, and *Gagik T.*

That is the "deliberate[ly] acquiesce[d]" course of conduct that gives rise to a protected liberty interest. *Yu*, Ex. L at 9 (quoting *Martinez*, 2026 WL 2262269, at *5). In the words of the court in *Zhou*, "[c]onsidering the arc of the government's sustained conduct towards Petitioner," he "developed a substantial liberty interest in continued release." Ex. M at 11. Petitioner built a life in reliance on that acquiescence: a home, a daughter he raised there for five years, a public role in his community, and pending applications he pursued through every channel the government offered. Fan Decl. ¶¶ 4–7; X. Fan Decl. ¶¶ 1–2. The interest at stake is "the most elemental of liberty interests—the interest in being free from physical detention by one's own government," *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion), and the Constitution does not permit the government to extinguish it by surprise.

## III. RESPONDENTS DEPRIVED PETITIONER OF THAT LIBERTY WITHOUT THE PROCESS THE CONSTITUTION REQUIRES

What process is due is determined by the three factors of *Mathews v. Eldridge*: the private interest affected; the risk of an erroneous deprivation through the procedures used and the value of additional safeguards; and the government's interest, including the burden that additional procedures would impose. 424 U.S. at 335; *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) (applying *Mathews* to § 1226(a) detention). Due process "usually" requires a hearing *before* the state deprives a person of liberty; the exceptions are reserved for situations in which "quick action" is necessary or pre-deprivation process is impractical. *Zinermon*, 494 U.S. at 127–28; *Mathews*, 424 U.S. at 333 (opportunity to be heard must come "at a meaningful time and in a meaningful manner") (quoting *Armstrong*, 380 U.S. at 552). **Every factor favors Petitioner, as it did in *Yu*, *Zhou*, and *Xu*.**

### A. The private interest

The interest is physical liberty itself, and it is at its most substantial where, as here, the person has lived free for more than a decade, raised a child in the home, and built a public life in the community. *Ortega*, 415 F. Supp. 3d at 970 (substantial liberty interest where petitioner was living with his wife, working, and developing friendships in his community); *Zhou*, Ex. M at 12. Petitioner lived at the same address for years, drove his daughter to school almost every day, led a community organization, and was pursuing three separate immigration applications. Fan Decl. ¶¶ 4–7, 14; X. Fan Decl. ¶ 2. The deprivation has now lasted more than fifteen months and has cost him his home and his daughter her schooling. Fan Decl. ¶¶ 29–31; X. Fan Decl. ¶¶ 5–7.

### B. The risk of erroneous deprivation

"[W]here a petitioner has not received a hearing or other process prior to the revocation of her liberty, 'the risk of an erroneous deprivation [of liberty] is high.'" *Zhou*, Ex. M at 12 (quoting *Singh v. Andrews*, 803 F. Supp. 3d 1035, 1047 (E.D. Cal. 2025)). **The government's own record shows how high it was here.** The arrest was carried out under an operation whose stated focus was "individuals with executable final orders of removal," a category to which Petitioner has never belonged. Ex. A at 2. The arresting agents were Border Patrol officers from El Centro working from a prepared file, who "positively matched" Petitioner from a distance and whose entire stated basis for the arrest was that his visa had been revoked in 2014. Ex. A at 2–3. **No one asked Petitioner a single question before deciding to take him into custody;** the only words exchanged were an explanation in a language he does not speak and a refusal of his request to call a lawyer. Ex. A at 3; Fan Decl. ¶¶ 19–20.

A hearing before a neutral decision-maker would have surfaced, at no cost to the government, everything the file omitted: that Petitioner had a pending asylum application and a pending relative petition on which USCIS had interviewed him months earlier; that USCIS had twice granted him work authorization; that he had lived at the same address for years and had a lawful-permanent-resident daughter living with him; that he had no criminal history anywhere in the United States; that he had no passport and no means of leaving the country; and that every piece of information in the government's possession about him was years old. Fan Decl. ¶¶ 4–16; Exs. C–F. That is precisely the information a pre-deprivation hearing exists to elicit, and the complete absence of any such process is what the Due Process Clause forbids. *Zinermon*, 494 U.S. at 127–32; *Xu*, Ex. N at 11–12 (finding a high risk of erroneous deprivation where ICE detained the petitioner on a mistaken premise without any pre-deprivation inquiry).

**C. The government's interest**

The government has a legitimate interest in enforcing the immigration laws and in detaining noncitizens who are dangerous or likely to abscond. **It has no cognizable interest in doing so *without a hearing*.** "[I]f the government wishes to re-arrest [Petitioner] at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing [or other procedure] is low." *Zhou*, Ex. M at 13 (quoting *Ortega*, 415 F. Supp. 3d at 970); see *Morrissey*, 408 U.S. at 483.

Nor was there any exigency that could have justified dispensing with process. Respondents had known Petitioner's immigration status since 2014 and his address for years. The file from which the agents worked was, by their own account, the product of "extensive research" conducted in advance, and it contained an administrative arrest warrant that someone had taken the time to sign before the operation began. Ex. A at 2. The agents then watched Petitioner's home for nearly four hours before approaching him. Ex. A at 3; Fan Decl. ¶ 17. **An agency with the time to research, prepare, sign, and surveil had the time to mail a notice and schedule a hearing.** See *Zhou*, Ex. M at 12–13 (due process "usually" requires a pre-deprivation hearing, the exceptions for quick action or impracticability did not apply, and "Respondents ha[d] not argued that Petitioner was an imminent risk of flight or that some other exigency required her immediate arrest"). Petitioner had no travel document and could not have gone anywhere. Fan Decl. ¶ 8. **Nothing about him had changed in eleven years; what changed in July 2025 was the government's enforcement priorities, and a change in the government's priorities is not an emergency that excuses the Constitution.**

The administrative burden of a pre-deprivation hearing is minimal. The government already maintains an apparatus of Immigration Judges who conduct custody hearings every day, and this District's decisions ordering such hearings have been implemented without difficulty. *Zhou*, Ex. M at 12–13; *Xu*, Ex. N at 11–12.

Each *Mathews* factor therefore points the same way: **Petitioner was entitled to notice and a hearing before he was taken into custody, and he received neither.**

## IV. THE BOND HEARINGS HELD AFTER THE ARREST DID NOT CURE THE VIOLATION

Respondents will argue that whatever process Petitioner was owed before his arrest, he has since received it: he has had four custody hearings before Immigration Judges, including one at which the government bore the burden of proof, and his appeal is pending before the BIA. The argument fails for three independent reasons, and courts in this District have rejected it in every one of the cases on which this Petition relies.

**First, a post-deprivation hearing answers a different question. A bond hearing asks whether a person already in custody should remain there. A pre-deprivation hearing asks whether the government may take him into custody at all. The second question was never asked.** "In the absence of an initial custody determination, which establishes a lawful basis for detention in the first instance, a subsequent bond hearing 'is no substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip' Petitioner of his freedom." *Dominguez Perez v. Acting Warden of the Adelanto Det. Ctr.*, No. 5:26-cv-03936-MBK, slip op. at 13 (C.D. Cal. July 30, 2026) (quoting *Garcia-Maya v. Mattos*, No. 2:26-cv-01513-RFB-BNW, 2026 WL 1965886, at *8 (D. Nev. July 7, 2026), and *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 497 (S.D.N.Y. 2025)).

**Second, the harm a pre-deprivation hearing prevents is the deprivation itself, and that harm cannot be undone after the fact.** "[C]ourts in this District have

concluded that a post-deprivation bond hearing ordinarily 'is not an adequate substitute' for a pre-deprivation hearing." *Yu*, Ex. L at 10 (quoting *Herman*, 2026 WL 1723960, at *5 (collecting cases)). "Many courts considering this issue have found that a post-detention bond hearing does not rectify the harm of a due process violation because the petitioner 'will have already suffered the harm' that such petitions raise—her potentially erroneous detention." *Zhou*, Ex. M at 13 (citing *Hasratyan v. Bondi*, No. 5:26-cv-00210-MCS-ADS, 2026 WL 288909, at *4 (C.D. Cal. Feb. 2, 2026); *Saballos Rosales v. Noem*, No. 5:26-cv-00112-JWH-MBK, 2026 WL 761371, at *3 (C.D. Cal. Mar. 16, 2026)). "The fact that Petitioner was provided with a post-deprivation court-ordered bond hearing does not cure the initial constitutional violation of unlawfully revoking Petitioner's liberty and detaining him without any process for nearly two months." *Charan S.*, 2026 WL 1144158, at *7; see also *Riveros-Sanchez v. City of Easton*, 861 F. App'x 819, 822 (3d Cir. 2021) ("[I]f a pre-deprivation hearing was required, then no amount of post deprivation process could cure the . . . initial failure to provide a hearing."), quoted in *Zhou*, Ex. M at 14.

**Third, and decisively for this case, the fact that the government later carried its burden at a bond hearing does not change the analysis.** The petitioner in *Xu* had received exactly what Respondents will say Petitioner received: a court-ordered bond hearing at which the government bore the burden of proof, which the petitioner lost, followed by an appeal to the BIA. Ex. N at 3–4. Judge Donahue nonetheless held that "[t]he bond hearings did not cure the failure to provide pre-deprivation process," relying, among other grounds, on the belatedness of those hearings and on the principle that post-detention process is no substitute for the process that was due before detention. Ex. N at 13–14 (citing *Charan S.*, 2026 WL 1144158, at *7; *Mumaev v. Semaia*, No. 5:25-cv-03409-FLA (MAR), 2026 WL 530765, at *6 (C.D. Cal. Feb. 20, 2026) (bond hearing six months after re-detention did not cure violation; release ordered); *Torres Osmel v. Marin*, No. CV 26-1548-E,

2026 WL 1209477, at *3 (C.D. Cal. Apr. 29, 2026) ("extremely belated bond hearings" did not remedy the violation; status quo ante restored)). **The court ordered release.** Ex. N at 14–15.

Petitioner's hearings were at least as belated: the government was first required to justify his detention more than six months after it began. Ex. K at 6. By then the harm a pre-deprivation hearing exists to prevent had long since occurred. See ¶¶ 29–31, 43, *supra*.

**The outcome of those later hearings is beside the point, and Petitioner does not ask the Court to revisit it.** Whether an Immigration Judge, months into a detention, found reasons to continue it says nothing about whether the Constitution permitted the detention to begin as it did. The habeas remedy restores the status quo ante; it does not ask what the government might have been able to prove had it followed the Constitution in the first place. *Lujan v. Garcia*, 734 F.3d 917, 935 (9th Cir. 2013); see Part VI, *infra*. Respondents remain free to seek Petitioner's detention in the future through the process the Constitution requires. What they may not do is retain the benefit of a detention that began in violation of it.

## V. EXHAUSTION IS NOT REQUIRED

Exhaustion of administrative remedies is not a jurisdictional prerequisite to a § 2241 petition; it is a prudential doctrine that courts "have discretion to waive." *Laing*, 370 F.3d at 998; *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012). Waiver is appropriate where "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing*, 370 F.3d at 1000. Each ground applies.

**The claim is constitutional, and "[c]onstitutional claims are generally excepted from the exhaustion requirement because neither immigration judges nor the BIA are permitted to consider constitutional challenges to the statutes they administer."** *Zhou*, Ex. M at 8 n.4 (citing *Sola*, 720 F.3d at 1135); *Yu*, Ex. L at 6–7 (citing *Padilla-Padilla*, 463 F.3d at 977, and *Matter of Fuentes-Campos*, 21 I. & N. Dec. at 912); *Xu*, Ex. N at 6. **The remedy sought—restoration of the liberty Petitioner held before his arrest—is one no Immigration Judge can grant:** as the court in *Yu* agreed, "neither tribunal can turn back the clock to furnish the pre-deprivation hearing Petitioner was owed." Ex. L at 6 (internal quotation marks omitted). And none of the purposes that prudential exhaustion serves is implicated. No agency expertise is needed to decide whether the government may arrest a person without process; no administrative record is required, because the facts are drawn from the government's own documents; and there is no administrative mistake for the agency to correct, because the agency has no authority over the question. *Puga*, 488 F.3d at 815; *Yu*, Ex. L at 7 (an "administrative appellate record is not necessary to resolve" the constitutional claims) (quoting *Miri*, 2026 WL 622302, at *10–11, and *Hernandez*, 872 F.3d at 989).

Petitioner's pending BIA appeal does not alter the analysis. In *Xu*, the petitioner's bond appeals were likewise pending before the BIA when the court granted relief; the court held that exhaustion was not required because the BIA cannot adjudicate the constitutional claim and because the petitioner was not seeking review of any custody determination. Ex. N at 6. The same is true here. That appeal has been pending for more than nine months without decision, Ex. J, which independently establishes that the remedy is "not efficacious" and that further delay would inflict irreparable injury. *Laing*, 370 F.3d at 1000.

## VI. THE REMEDY IS RELEASE

"[T]he purpose of habeas remedies is to put the defendant back in the position he would have been in if the constitutional violation never occurred." *Lujan*, 734 F.3d at 935 (cleaned up); see *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (the appropriate remedy "as much as possible restores" the litigant "to the circumstances that would have existed had there been no constitutional error"); *United States v. Morrison*, 449 U.S. 361, 364 (1981) ("remedies should be tailored to the injury suffered"). **Where the violation is the failure to provide process before detention, the position Petitioner occupied before the violation is liberty, and release is the remedy that restores it.** *Yu*, Ex. L at 9–10 ("Because Petitioner's detention has been unlawful from the outset, . . . Petitioner's prompt release is the remedy that will best return Petitioner to the status quo") (quoting *Chowdhury v. Lyons*, No. 5:26-cv-01252-MEMF-E, 2026 WL 1045562, at *7 (C.D. Cal. Apr. 13, 2026), and citing *Movsesyan v. Bondi*, No. 5:26-cv-00875-MBK, 2026 WL 712824, at *4 (C.D. Cal. Mar. 9, 2026)); *Zhou*, Ex. M at 14 (ordering release "on the conditions that were initially imposed") (collecting cases); *Xu*, Ex. N at 14–15 (ordering release within 24 hours). "This principle has particular force where, as here, the protections at issue are intended to prevent an unlawful detention in the first place." *Yu*, Ex. L at 10 (citing *Morrison*, 449 U.S. at 364).

**A new bond hearing would not be an adequate remedy,** for the reasons given in Part IV: it would ask a different question, it would come fifteen months after the harm it is supposed to prevent, and it would leave Respondents in possession of the fruits of an unconstitutional arrest. The order in *Yu* supplies the appropriate form of relief: release, together with an injunction barring re-detention "without first providing notice and a hearing before a neutral arbiter in which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a flight risk or danger to the community." Ex. L at 10. That order protects both sides' legitimate interests. **Respondents retain every lawful means of seeking Petitioner's**

**detention; they simply must use them.** Petitioner regains the liberty he lawfully held on the morning of July 29, 2025, together with the property taken from him that day. See *Zhou*, Ex. M at 14 (ordering return of property confiscated during arrest).

Petitioner has a place to live and every reason to appear: his asylum case, pending for nine years, is finally before an Immigration Judge, and he has pursued it through every available channel for the entire period of his detention. Fan Decl. ¶¶ 27, 36–37. Nothing about release on these terms impairs the government's ability to complete his removal proceedings.

## VII. CONCLUSION

For more than eight years the government knew where Wenfeng Fan lived and chose to leave him there. **When it changed its mind, the Constitution required it to tell him and to give him a chance to be heard before it took him away. It did neither.** The Court should grant the Petition, issue the writ, order Petitioner's immediate release, enjoin Respondents from re-detaining him without notice and a hearing before a neutral decision-maker, order the return of his property, and grant such further relief as is just.

Dated: November 08, 2026

Respectfully submitted,

*/s/* Xin Tian

Xin Tian, Esq.

Attorney for Petitioner Wenfeng Fan